IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| MICHAEL D. MADRON, | § | |
| Institutional ID No. 2158507, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 1:22-CV-00031-BU |
| | § | |
| WARNER B. MASSEY, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS
OF THE UNITED STATES MAGISTRATE JUDGE**

Plaintiff MICHAEL D. MADRON, proceeding pro se, previously a prisoner at the Texas Department of Criminal Justice's (TDCJ) Middleton Unit, brings this lawsuit under 42 U.S.C. § 1983. Madron initially filed suit in the Eastern District of Texas against 13 defendants and raised claims of deliberate indifference to serious medical needs and violations of the Americans with Disabilities Act (ADA) and the Rehabilitation Act (Rehab Act).[1]

On March 29, 2023, Magistrate Judge Nicole Mitchell of the Eastern District of Texas severed Madron's claims against Dr. Warner B. Massey that relate to Madron's incarceration at the Middleton Unit and transferred those claims to this Court. Dkt. No. 23.

---

[1] *See Madron v. Texas Department of Criminal Justice, et al.*, Civil Action No. 6:21-CV-343, in the Eastern District of Texas.

Madron received leave to proceed *in forma pauperis* under 28 U.S.C. § 1915. Dkt. No. 5. Senior United States District Court Judge Sam R. Cummings transferred this case to the undersigned for an initial case review under 28 U.S.C. §§ 1915 and 1915A. Dkt. No. 28. The Court stayed this case pending Madron's responses to a second magistrate judge's questionnaire. Dkt. No. 37. The Court finds that the purposes of the administrative stay have been served and ORDERS that stay be lifted and the case reopened for further proceedings.

For the reasons below, the Court should dismiss this case without prejudice under Federal Rule of Civil Procedure 41(b). In the alternative, after careful consideration of the claims in Madron's Complaint, and the amendments to those claims through his responses to the Court's questionnaire, *see* Dkt. No. 35, the undersigned recommends that Madron's claims against Dr. Massey be dismissed.

## I.  INVOLUNTARY DISMISSAL UNDER RULE 41(b)

On May 10, 2024, the Court ordered Madron to complete a second magistrate judge's questionnaire by no later than May 31, 2024. Dkt. No. 37. On June 20, 2024, the Court entered an Order to Show Cause after Madron failed to respond. Dkt. No. 38. Madron did not respond to the Show Cause Order either.

Rule 41(b) of the Federal Rules of Civil Procedure permits a court to dismiss an action sua sponte for failure to comply with court orders or for failure to prosecute. *Nottingham v. Warden, Bill Clements Unit*, 837 F.3d 438, 440 (5th Cir. 2016); *McCullough v.*

*Lynaugh*, 835 F.2d 1126, 1127 (5th Cir. 1988). This authority flows from a court's inherent power to control its docket and prevent undue delays in the disposition of pending cases. *Link v. Wabash R.R. Co.*, 370 U.S. 626, 629–31 (1962). A Rule 41(b) dismissal may be with or without prejudice. *Long v. Simmons*, 77 F.3d 878, 880 (5th Cir. 1996). Dismissal with prejudice is appropriate only where a litigant's acts or omissions are "the result of purposeful delay or contumaciousness and the record reflects that the district court employed lesser sanctions before dismissing the action [with prejudice]." *Id.*

Madron has failed to comply with two court orders even after the undersigned warned him that failure to do so would lead the undersigned to recommend dismissal under Rule 41(b). Because the undersigned has no basis to believe that Madron has acted with bad faith or with delay in mind, though, the undersigned recommends that his claims be dismissed *without* prejudice.

Alternatively, the undersigned recommends that Madron's claims be dismissed as frivolous and for failure to state a claim upon which relief may be granted for the reasons that follow.

## II.  BACKGROUND

Madron was convicted in Dawson County and sentenced in September 2017 to ten years in prison. Dkt. No. 1 at 8. He arrived at TDCJ's Middleton Unit for his initial intake on October 23, 2017. *Id.* Madron's claims against Dr. Massey involve two unrelated medical issues.

3

First, Madron states that sometime during late October 2017, he fractured his foot while playing basketball and was transported to the nearby Robertson Unit because it "maintains a 24-hour infirmary," while the Middleton Unit does not. *Id.* After nurses evaluated his foot, Madron was provided crutches and referred to Dr. Massey at the Middleton Unit for the following day. *Id.* However, Madron states that the Robertson Unit nurses "did not do an x-ray of the left foot and did not issue Plaintiff a [lay-in] pass to see Dr. Massey, at the Middleton Unit the following morning." *Id.* at 8–9.

Madron claims that upon his return to the Middleton Unit, he was moved from a top bunk to a bottom bunk due to his foot injury. *Id.* at 9. He was also issued a cell pass to excuse him from his working duties. Dkt. No. 35 at 7.

But Madron claims that while an x-ray of his foot was ordered, it was never performed. *Id.* And he states that he was denied access to the medical unit despite the referral because he did not have a lay-in pass. *Id.* The upshot of this was that the only treatment Madron claims to have received for his broken foot was the issuance of crutches, and those were later taken away by security staff. *Id.* As a result, he alleges that he suffered severe pain as he was forced to walk without treatment or crutches. Dkt. No. 1 at 9.

Madron's second medical issue in this action involves a seizure. On November 14, 2017, Madron suffered a seizure "around 2:30-3:30 hrs." *Id.* He states that he "rolled out of bed and was thrashing around on the floor; resulting in fellow prisoners alerting guards[.]" *Id.* Madron was loaded on a gurney and taken to the Middleton Unit infirmary

4

where an unnamed Sergeant and Lieutenant arranged for his transport to the Robertson Unit because, again, the Middleton Unit did not have medical staff after 6:00 p.m. *Id.* Madron regained consciousness during his transport and had no recollection of having a seizure. *Id.* He states that he went to sleep in his cell and woke up on the gurney. *Id.*

At the Robertson Unit, Madron states that he was examined by Dr. Massey. *Id.* Madron quotes from the clinical notes of that examination and attaches them to his Complaint. Dkt. No. 1–1 at 5–8. Madron states that he was examined by Dr. Massey at approximately 7:00 a.m., although the clinical notes indicate it occurred at 5:30 a.m. *Compare* Dkt. No. 1 at 9, *with* Dkt. No. 1–1 at 5. He presented in the clinic with normal vital signs and a chief complaint of "reported seizure activity." Dkt. Nos. 1 at 9; 1–1 at 5. The clinical notes further reflect that Madron was experiencing nausea and pain that he scaled at 4 of out 10 in the mid-back area, but there was no report of fainting, loss of consciousness, headache, or having fallen. Dkt. Nos. 1 at 9–10; 1–1 at 5. He was also "ambulat[ing] with a steady and even gait[.]" Dkt. No. 1–1 at 7.

The clinical notes further reflect that: "Offender reports – he was told he had a seizure. He denies memory of the event." *Id.* at 5. The notes state that the length of the seizure was unknown and that it was Madron's first seizure. Dkt. Nos. 1 at 9–10; 1–1 at 5. All other recorded assessments of Madron's appearance, skin, consciousness, gait, pupils, and other objective clinical criteria were normal. Dkt. No. 1–1 at 5–6.

Dr. Massey noted Madron's vital signs and made other clinical assessments. *Id.* at 8. He found Madron to be alert, oriented, and able to recount his history. *Id.* Dr. Massey acknowledged Madron's recollection that his mother and aunt have histories of seizure disorders but noted that Madron had never had a seizure before. *Id.* Massey concluded that Madron had a "questionable [history] of [seizure]. *Id.* The clinical records reflect a treatment plan of "Return to clinic as needed," and "since there is no [definite history] of [seizure] will [discharge] and reevaluate if further [seizure] occurs." *Id.*

Madron complains that Dr. Massey "refused to place recommendation and restriction in Plaintiff's Health Summary for Classification Form (HS-18) that Plaintiff should be housed at a 'Single Level Facility, Row Assignment Ground floor only; Bunk Assignment-Lower only; No working around machine with moving parts,' despite knowledge Plaintiff had a history of seizures, he had just had a seizure, and he knew he was subject to having a seizure in the future." Dkt. No. 1 at 10. In this manner, Madron alleges that Dr. Massey was deliberately indifferent to his serious medical needs. *Id.* And as a result of this deliberate indifference, Madron claims he suffered a second seizure two and a half years later on April 12, 2020, when fell out of his top bunk at the Beto I Unit, sustaining serious injuries.[2] *Id.* at 10, 13. Madron had been transferred from the Middleton Unit to the Beto I Unit on December 27, 2017. *Id.* at 11.

---

[2] In the April 2020 incident at the Beto I Unit, Madron alleges he suffered spinal fractures, compressed disks, and double fractures of: coccyx, pelvis, four ribs, and clavicle, and a brain injury that required a craniotomy.

Madron initially brought a personal capacity claim for money damages against Dr. Massey for deliberate indifference to serious medical needs and an official capacity claim for violations of the ADA and Rehab Act. *Id.* at 5–6. Through his questionnaire responses, however, he abandoned the deliberate indifference claim in favor of a negligence claim. *See* Dkt. No. 35 at 4–5. Nevertheless, the undersigned analyzes both claims below. It is unclear whether Madron still wishes to prosecute the ADA and Rehab Act claims in this lawsuit, but the undersigned will assume that he does. *Id.* at 3–5.

### III.  LEGAL STANDARDS

A court must dismiss a complaint filed by a prisoner against a government entity or employee if the court determines the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. § 1915A(b) (applying section to any suit by a prisoner against certain governmental entities, regardless of whether the prisoner is proceeding *in forma pauperis*).

A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint lacks an arguable basis in fact if it rests upon clearly baseless factual contentions, and similarly lacks an arguable basis in law if it contains indisputably meritless legal theories. *See id.* at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005).

7

Dismissal for failure to state a claim—whether under Section 1915(e)(2)(B)(ii), Section 1915A(b)(1), or Rule 12(b)(6)—"turns on the sufficiency of the 'factual allegations' in the complaint." *Smith v. Bank of Am., N.A.*, 615 F. App'x 830, 833 (5th Cir. 2015) (per curiam) (quoting *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam)). Thus, if a plaintiff "plead[s] facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that they contend entitle them to relief, the claims should not be dismissed merely because the plaintiff fails to articulate the proper legal theory that otherwise makes those facts actionable in court. *Johnson*, 574 U.S. at 11–12 (citing Fed. R. Civ. P. 8(a)(2)–(3), (d)(1), (e)).

Courts accept *well-pleaded* factual allegations as true. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016). This means the factual allegations, while not required to be detailed, must amount to more than mere labels, conclusions, or a statement of the legal elements of a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Chhim*, 836 F.3d at 469.

For claims to be substantively plausible, a plaintiff need not establish that the pleaded facts probably occurred as alleged, but the facts must allow the court "to infer more than the mere possibility of misconduct." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678–79). Even pro se plaintiffs must plead facts that raise the right to relief above a speculative level. *Chhim*, 836 F.3d at 469 (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)). And

when plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

When evaluating a complaint under these standards, courts liberally construe the pleadings of pro se plaintiffs, holding their complaints to "less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). But "liberal construction does not require that the Court . . . create causes of action where there are none." *Smith v. CVS Caremark Corp.*, No. 3:12-cv-2465-B, 2013 WL 2291886, at *8 (N.D. Tex. May 23, 2013). "To demand otherwise would require the 'courts to explore exhaustively all potential claims of a *pro se* plaintiff'" and would "'transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party.'" *Jones v. Mangrum*, No. 3:16-cv-3137, 2017 WL 712755, at *1 (M.D. Tenn. Feb. 23, 2017) (quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)).

Ultimately, "'[d]etermining whether a complaint states a plausible claim for relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 679).

IV.  ANALYSIS

*1. Deliberate indifference and negligence claims are barred by statute of limitations.*

Although Madron appears to have abandoned his deliberate indifference claims, had he not they would be barred by § 1983's two-year statute of limitations, as would his negligence claims. "Where it is clear from the face of a complaint filed in forma pauperis that the claims asserted are barred by the applicable statute of limitations, those claims are properly dismissed pursuant to § 1915." *Gonzalez v. Wyatt*, 157 F.3d 1016, 1019–20 (5th Cir. 1998) (quoting *Gartrell v. Gaylor*, 981 F.2d 254, 256 (5th Cir. 1993)).

Section 1983 does not include a statute of limitations. Instead, the Supreme Court has determined that the general statute of limitations of the forum state for personal injuries governs § 1983 claims. *Owens v. Okure*, 488 U.S. 235, 239 (1989). In Texas, a plaintiff has two years from the time his claims accrue to file a personal injury claim, so the same is true for § 1983 claims. *Balle v. Nueces Cnty., Tex.*, 952 F.3d 552, 556 (5th Cir. 2017) (citing *Tex. Civ. Prac. & Rem. Code Ann.* § 16.003(a)). And because federal courts borrow the Texas statute of limitations in § 1983 cases, Texas's equitable tolling principles are also borrowed. *See Bd. of Regents of Univ. of State of N.Y. v. Tomanio*, 446 U.S. 478, 485 (1980).

But accrual is a question of federal law, not state law. *Nottingham v. Richardson*, 499 F. App'x 368, 375 (5th Cir. 2012); *see also Wallace v. Kato*, 549 U.S. 384 (2007) (holding that while the forum state's statute of limitations are used in a Section 1983 claim,

10

federal law governs when the cause of action accrues). And "[u]nder federal law, the [limitations] period begins to run 'the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured.'" *Russell v. Bd. of Tr.*, 968 F.2d 489, 493 (5th Cir. 1992) (quoting *Helton v. Clements*, 832 F.2d 332, 335 (5th Cir. 1987)).

Awareness for accrual purposes consists of two elements: (1) awareness of the injury, and (2) awareness of the connection between the injury and the defendant's actions. *See Stewart v. Par. of Jefferson*, 951 F.2d 681, 684 (5th Cir. 1992). It is not required that a plaintiff realize that a legal cause of action exists, provided he knows of the *facts* that would ultimately support a claim. *See Harrison v. United States*, 708 F.2d 1023, 1027 (5th Cir. 1983) ("The plaintiff need not have knowledge of fault in the legal sense for the statute to begin to run, but she must have knowledge of facts that would lead a reasonable person (a) to conclude that there was a causal connection . . . or (b) to seek professional advice, and then, with that advice, to conclude that there was a causal connection between the [defendant's acts] and injury."); *see also Rotella v. Pederson*, 144 F.3d 892, 894 (5th Cir. 1998) (holding that ignorance of the law and illiteracy are not grounds for equitable tolling) (citing *Piotrowski v. City of Houston*, 51 F.3d 512, 516 (5th Cir. 1995); *Barrow v. New Orleans S.S. Ass'n*, 932 F.2d 473, 478 (5th Cir. 1991)).

Moreover, a plaintiff need not have actual knowledge of the facts giving rise to a claim if the circumstances would lead a reasonable person to investigate further. *See Jensen*

*v. Snellings*, 841 F.2d 600, 606 (5th Cir. 1988) ("Under federal law, the limitations period commences when 'the aggrieved party has either knowledge of the violation or notice of facts which, in the exercise of due diligence, would have led to actual knowledge' thereof." (quoting *Vigman v. Cmty. Nat'l Bank & Tr. Co.*, 635 F.2d 455, 459 (5th Cir. 1981)).

Madron pleads that he was transferred from the Middleton Unit to the Beto I Unit on December 27, 2017. And prior to being transferred, he was aware of all facts giving rise to his deliberate indifference claims against Dr. Massey, or that would have caused a reasonable person to investigate those claims further. Moreover, those facts appear to be of a nature that would result in his immediate awareness of both the injury and the connection between the injury and Dr. Massey's actions. For instance, he knew that he had injured his foot, that the Robertson Unit medical staff did not x-ray the foot, that he did not receive a lay-in pass to see Dr. Massey, that his crutches were removed by security, and that he continued to suffer severe pain. Dkt. No. 1 at 8–10.

Additionally, Madron believed that he had suffered a seizure. *Id.* He knew that Dr. Massey assessed that event as only a "questionable seizure" and recommended a conservative, "wait and see" approach before ordering more extensive testing. *Id.* Madron knew of his family history of seizures. *Id.* He asked Dr. Massey what caused the seizure and how to prevent future seizures, and claims Dr. Massey told him that he would reevaluate Madron's condition if he had another seizure. Dkt. No. 35 at 7. And he knew that Dr. Massey did not order any restrictions related to his possible seizure. Dkt. No. 1 at 8–10.

Despite this knowledge, Madron did not file his Complaint until August 30, 2021, almost four years after the events he complains of and almost two years after the statute of limitations expired. But Madron attempts to address this problem by pleading:

> Defendant Dr. Massey told Plaintiff not to worry about diagnosis, treatment, or restrictions and that he would reevaluate Plaintiff if he had another seizure. Thus, the instant claim of deliberate indifference to serious medical needs and/or deliberate indifference to health and safety was an ongoing and continuous episode; from November 14, 2017 thru April 12, 2020.

Dkt. No. 1 at 10. This argument appears to invoke the continuing tort doctrine.

A continuing tort is one that continues to inflict additional injury until the tortious conduct ceases. *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 592 (Tex. 2017) (quoting *First Gen. Realty Corp. v. Md. Cas. Co.*, 981 S.W.2d 495, 501 (Tex. App.—Austin 1998, pet. denied)). *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 451 (5th Cir. 2007) (quoting *Upjohn Co. v. Freeman*, 885 S.W.2d 538, 542 (Tex. App.—Dallas 1994, writ denied)). "For continuing torts, 'the cause of action is not complete and does not accrue until the tortious acts have ceased.'" *Id.* (quoting *Twyman v. Twyman*, 790 S.W.2d 819, 821 (Tex. App.—Austin 1990), *rev'd on other grounds*, 855 S.W.2d 619 (Tex. 1993)).

First, the continuing tort doctrine is an accrual doctrine, not a tolling doctrine. And as explained above, accrual of a claim is a question of federal law. *See Nottingham*, 499 F. App'x at 375. Under federal law, accrual occurs "the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured." *Russell*, 968 F.2d at 493. For Madron, as explained above, this means his claims

accrued no later than December 27, 2017, when he left the Middleton Unit and Dr. Massey's care.

Second, "[i]n determining whether to apply the continuing tort doctrine, Texas courts distinguish between situations involving 'repeated injury proximately caused by repetitive wrongful or tortious acts' constituting continuing torts and 'continuing injury arising from one wrongful act' which do not." *McGowan v. S. Methodist Univ.*, 2024 WL 455340 (N.D. Tex. Feb. 2024) (quoting *Decker v. Routledge*, 2020 WL 291804, at *3 (S.D. Tex. 2020) (internal quotations omitted)).

Here, there were no repetitive tortious acts, but rather two allegedly wrongful acts—failure by Dr. Massey to order more extensive testing and failure to impose restrictions Madron believes should have been imposed—both of which occurred immediately after Madron's first seizure. At most, this failure lasted the five weeks from Dr. Massey's examination of Madron on November 14, 2017, to his transfer out of the Middleton Unit on December 27, 2017. Even if Madron claims that Dr. Massey's failure to impose appropriate restrictions followed him to the Beto I Unit, that is implausible when considering that each TDCJ Unit conducts its own intake assessment of a prisoner, including his medical needs and related needs for restrictions. Thus, whatever harm Dr. Massey caused, that causal chain was broken upon Madron's transfer to the Beto I Unit. Importantly, it is undisputed that Madron was seizure-free for almost two and a half years after being released from Dr. Massey's care.

14

As for tolling the statute of limitations, Madron does not plead any facts from which the Court can infer a basis for tolling. As explained above, for this § 1983 case, the Court borrows from Texas both its statute of limitations and its equitable tolling principles. Equitable tolling is sparingly applied in Texas courts. *Myers v. Nash*, 464 F. App'x 348, 349 (5th Cir. 2012) (per curiam). To be entitled to equitable tolling under Texas law, a plaintiff must demonstrate that he "actively pursued his judicial remedies but filed a defective pleading during the statutory period" or "was induced or tricked by his adversary's misconduct into allowing filing deadlines to pass." *Bailey v. Gardner*, 154 S.W.3d 917, 920 (Tex. App.—Dallas 2005).

Madron does not claim that he was induced or tricked into missing the filing deadlines for his claim. Nor does it appear that he diligently pursued his legal remedies after becoming aware of his claims. For these reasons, Texas's equitable tolling principles are not available to him.

Texas law also provides for the suspension of a statute of limitations for those under a legal disability, including persons who are "of unsound mind." *Tex. Civ. Prac. & Rem. Code Ann.* § 16.003(a). But Madron does not claim to be of unsound mind.

Ultimately, the Court is without a basis to relieve Madron from the operation of the statute of limitations on his claim. For these reasons, the undersigned recommends that the

Court dismiss as time-barred Madron's claims of deliberate indifference and negligence against Dr. Massey.[3]

   2. *Even if they were not time-barred, Madron's deliberate indifference and negligence claims would fail to state a claim.*

Under the Eighth Amendment, prison officials have a duty to provide adequate medical care. *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). An inmate seeking to establish an Eighth Amendment violation regarding medical care must allege facts showing that prison officials were deliberately indifferent to his serious medical needs. *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)) (explaining that because "only the 'unnecessary and wanton infliction of pain' implicates the Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs") (emphasis in original).

"Deliberate indifference" means that the denial of medical treatment was "much more likely than not to result in serious medical consequences, and additionally that the defendants had sufficient knowledge of the situation so that the denial of medical care constituted wanton disregard of the prisoner's rights." *Johnson v. Treen*, 759 F.2d 1231, 1238 (5th Cir. 1985). In other words, "the plaintiff must show that the officials refused to treat

---

[3] Massey states that he cannot recall whether he submitted sick call requests or filed grievances regarding his Middleton Unit claims. Dkt. No. 1 at 11. But while the authenticated records—which fill two copy-paper boxes—contain Madron's grievances, there are none related to his claims against Dr. Massey. Thus, there is no basis for the Court to assume that the delay in filing this lawsuit was caused by Madron exhausting his administrative remedies.

him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Kelson v. Clark*, 1 F.4th 411, 417 (5th Cir. 2021).

To successfully claim deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and subjective test. *Rogers*, 709 F.3d at 410. An inmate must first prove an objective exposure to a substantial risk of serious bodily harm. *Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006). As to the subjective component, a prison official acts with deliberate indifference only where he (1) knows the inmate faces a substantial risk of serious harm and (2) disregards that risk by failing to take reasonable measures to abate it. *Id.* at 346; *see also Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999).

Allegations of malpractice, negligence, or unsuccessful treatment fail to establish deliberate indifference. *Gobert*, 463 F.3d at 346. Similarly, an inmate's disagreement with the medical treatment provided does not give rise to a constitutional claim. *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). The prison staff must have engaged in conduct that shows "a wanton disregard for any serious medical needs." *Treen*, 759 F.2d at 1238. And "the decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" *Domino v. Tex. Dep't of Crim. J.*, 239 F.3d 752, 756 (quoting *Estelle*, 429 U.S. at 107. Finally, "the 'failure to alleviate a significant risk that [the official]

17

should have perceived, but did not' is insufficient to show deliberate indifference." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 838) (1994),

Here, even if Madron could plausibly demonstrate an objective exposure to a substantial risk of serious harm in connection with Dr. Massey's acts or omissions, he has failed to plead facts from which this Court can reasonably infer that Dr. Massey refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any of Madron's serious medical needs. *See Kelson*, 1 F.4th at 417. With the benefit of hindsight, Dr. Massey would likely do more, but subjective deliberate indifference is not determined from the perspective of hindsight. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned" as an Eighth Amendment violation. *Farmer*, 511 U.S. at 838. In other words, deliberate indifference demands that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Here, even assuming Dr. Massey was aware of facts from which an inference of a substantial risk to Madron could have been drawn, there are no allegations to plausibly support that Dr. Massey drew that inference.

As explained above, it is well-settled that mere disagreement with the medical care by itself will not support a constitutional violation. *Norton*, 122 F.3d at 292.Thus, a claim that medical personnel should have provided additional or specialized care constitutes mere

disagreement over treatment, which is not actionable. *See Estelle*, 429 U.S. at 107 (explaining that the question of whether "additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment").

In this same vein, dissatisfaction with the lack of a closer or more thorough physical examination does not state a viable constitutional claim. *Molina v. Well Path*, No. 5:20-CV-081-BQ, 2021 WL 5343488, at *4 (N.D. Tex. Jan. 21, 2021); *see also Barnes v. Johnson*, 204 F. App'x 377, 379 (5th Cir. 2006) ("[Plaintiff's] assertion that [the defendant] did no more than a cursory examination but did not conduct a more through [sic] 'physical' examination . . . alleges, at most, negligence or medical malpractice, which do not give rise to a § 1983 cause of action, and an inmate's disagreement with his medical treatment does not establish a constitutional violation.").

In the questionnaire, the undersigned provided Madron with an explanation of the difference between deliberate indifference and negligence. *See* Dkt. No. 35 at 3–4. Madron was then asked at least two different ways whether he claimed that Dr. Massey was deliberately indifferent or negligence, and he responded that Dr. Massey had been negligent. *Id.* at 3–5. The undersigned agrees that, at most, Dr. Massey might have been negligent.

Madron's allegations, accepted as true, portray the classic example of a health care practitioner exercising his medical judgment, and Madron seeking to second-guess that judgment only after it proved to be in error. Based on these facts, the undersigned is unable to conclude that Dr. Massey's judgment was, at the time, unreasonable, let alone in wanton

disregard for Madron's medical needs. But as explained above, negligence is not actionable under § 1983. And for these reasons, even if Madron's deliberate indifference and negligence claims are not time-barred, they fail to state a claim and should be dismissed.[4]

   *3.  Madron fails to state an ADA or Rehab Act claim.*

Madron claims that he "is a qualified individual regarded as having a physiological or mental impairment that substantially limits one or more of his major life activities." Dkt. No. 1 at 20. Although Madron's ADA and Rehab Act claims do not appear to be time-barred, they still fail to state a claim.

"The [Rehab Act] is operationally identical to the ADA in that both statutes prohibit discrimination against disabled persons; however, the ADA applies only to public entities while the RA applies to any federally funded programs or activities, whether public or private." *Borum v. Swisher Cnty.*, No. 2:14-CV-127-J, 2015 WL 327508, at *3 (N.D. Tex. Jan. 26, 2015) (citing *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (per curiam)). Courts apply the same legal standards in analyzing claims under both the ADA and Rehab Act. *See Borum*, 2015 WL 327508, at *3 (citing *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011)). Thus, the undersigned analyzes Madron's ADA and Rehab Act claims as though they were raised as a single claim.

---

[4] It is unclear whether Madron sought to bring a claim against Dr. Massey based on his fractured foot and being denied crutches. But even assuming he brings such a claim, it would fail because Madron has not pleaded any facts from which the Court can infer that Dr. Massey was aware of his continued suffering and chose to ignore it. And for reasons explained, any claims arising from that set of facts be either time-barred or, for negligence, not actionable under § 1983.

The undersigned construes Madron's ADA claim against Dr. Massey as an official capacity claim because he cannot recover against Dr. Massey in his personal capacity under the ADA. *See, e.g.*, *Cole v. Velasquez*, 67 F. App'x 252 n.11 (5th Cir. 2003) (finding that the ADA's comprehensive remedial scheme bars suits against state officials in their individual capacities). A suit against a state official in their official capacity "is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). The ADA permits suits against state officials as representatives of the official's office. *United States v. Georgia*, 546 U.S. 151, 154 (2006) (finding that the ADA applies to state agencies and officials). Madron's claims against Dr. Massey, as a state official in his official capacity, are against Dr. Massey as an employee of the TDCJ, and thus Dr. Massey is a proper party for claims made under Title II of the ADA.

Additionally, unlike § 1983, the ADA "provide[s] for vicarious liability" so that "a plaintiff need not identify an official policy to sustain a claim against a public entity as it may be held vicariously liable for the acts of its employees under [the ADA]." *J.W. v. Paley*, 81 F.4th 440, 449 (5th Cir. 2023) (citing *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574–75 (5th Cir. 2002)).

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To allege a prima facie case under Title II, a plaintiff must

bring factual allegations showing: "(1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible . . . , and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Smith v. Harris Cnty.*, 956 F.3d 311, 317 (5th Cir. 2020) (quoting *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004)).

A plaintiff may satisfy the third prong of a Title II claim by alleging a failure to accommodate. *Windham v. Harris Cnty.*, 875 F.3d 229, 236 (5th Cir. 2017). And here, Madron claims that Dr. Massey "failed to reasonably accommodate Plaintiff's nervous system/cerebral disabilities" by denying him the appropriate restrictions to ground floor and bottom bunk. Dkt. No. 1 at 20. He further claims that Dr. Massey "knew Plaintiff had a seizure disorder[.]" *Id.* To allege a failure to accommodate claim, "a plaintiff must show that the entity knew of the disability and its consequential limitations, either because the plaintiff requested an accommodation or because the nature of the limitation was open and obvious." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723–24 (5th Cir. 2020).

Additionally, to recover compensatory damages under Title II, a plaintiff must prove that the discrimination was intentional. *Delano–Pyle*, 302 F.3d at 574. In the context of a failure-to-accommodate claim, this means the plaintiff must show the entity had "*at least* actual knowledge *that an accommodation is necessary*." *Paley*, 81 F.4th at 450 (quoting *Smith*, 956 F.3d at 319) (internal quotation marks omitted) (emphasis added). It is not

enough that the defendants were aware of the plaintiff's disability or even the resulting impairment. *Id.* at 450 (citing *Windham*, 875 F.3d at 238). They must both know that an accommodation is necessary and deliberately refuse to provide it. And while this may look and sound like deliberate indifference, the Fifth Circuit's cases that have addressed this issue have required "something more than deliberate indifference." *Id.* at 449–50 (citing *Cadena*, 946 F.3d at 724).

The undersigned now addresses whether Madron has plausibly alleged an ADA claim in connection with Dr. Massey's failure to provide him with his requested restrictions.[5]

### a. *A qualified individual with a disability.*

Title II of the ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). In 2008, Congress amended the ADA to expand the meaning of "disability" and broaden protections for persons with disabilities. *Willis v. Noble Env't Power, LLC*, 143 F. Supp. 3d 475, 480–81 (N.D. Tex. 2015). "The definition of disability . . . shall be construed in favor of broad coverage." 42 U.S.C. § 12102(4)(A).

---

[5] Courts have interpreted "public entity" under the ADA to include prisons. *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).

Although the ADA amendments made it easier for a plaintiff to allege a qualifying disability, the plaintiff is not absolved from the responsibility to plausibly allege a disability. *Neely v. PSEG Tex., L.P.*, 735 F.3d 242, 245 (5th Cir. 2013). And to plausibly allege a qualifying disability, a plaintiff must show an impairment that "substantially limits one or more major life activities." 42 U.S.C. § 12102(a)(1); *see also Ball v. LeBlanc*, 792 F.3d 584, 597 (5th Cir. 2015) (A qualifying disability is one that "substantially limit[s] either a major life activity or the operation of a major bodily function."). A physical impairment is "[a]ny physiological disorder or condition . . . affecting one or more body systems." 28 C.F.R. § 35.108(b)(1). This includes epilepsy and, presumably, other qualifying neurological disorders. *Id.* Thus, it appears plausible that Madron may have suffered from a physical impairment on November 14, 2017, although little was known about the nature or duration of the impairment based on the limited clinical findings that day.

The next inquiry under the "qualified individual with a disability" analysis is whether the physical impairment "substantially limits" a major life activity. Beyond the regulation's general guidance, "substantially limits" is not defined by Congress or the Fifth Circuit, and without a precise definition, "trial courts are left to pinpoint where the impairment falls within the substantial limitation spectrum." *Willis*, 143 F. Supp. 3d at 480–81.[6]

---

[6] The *Willis* case, as well as other cases cited in this section, determine a plaintiff's disability status in the context of employment discrimination claims, which proceed under Title I of the ADA. The amended ADA, however, revised the definition of disability under each title, and so borrowing a Title I analysis of "disability" is appropriate to the undersigned's Title II analysis here.

To aid this process, courts apply factors, mirroring the regulation's guidance in 28 C.F.R. § 35.108(d)(3)(ii), to determine whether the impairment creates a substantial limitation. *Id.* (citing *Holland v. Shineski*, No. 3:10-cv-0908–B, 2012 WL 162333, at *6 (N.D. Tex. Jan. 18, 2012)). Those factors include "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long term impact, or the expected permanent or long term impact of, or resulting from, the impairment." *Holland*, 2012 WL 162333 at *6 (citing *Armstrong v. Boehringer Ingelheim, Pharm., Inc.*, No. 3:08-CV-1458–O, 2010 WL 2540751, at *15 (N.D. Tex. June 21, 2010)).

When a physical injury is a short-term, transitory condition with no permanent or long-term impacts, the injury is not a substantial limitation. *Willis*, 143 F. Supp. 3d at 484; *see also Bankhead v. Lifeguard Ambulance Serv. of Tex.*, No. 4:18-CV-605-A, 2019 WL 2904364, at *3 (N.D. Tex. July 3, 2019) (finding that an injured ankle, resulting in pain and walking with a medical boot, was a temporary injury and not a disability); *see also Street v. Maverick Tube Corp.*, No. 4:15-CV-02736, 2016 WL 8711338, at *6 (S.D. Tex. June 17, 2016), *report & rec. adopted*, 2016 WL 3948106 (S.D. Tex. July 19, 2016) ("[I]t is well-settled that a temporary injury, such as a broken foot, is not considered a 'disability' under the ADA.").

Madron's pleadings and the authenticated records agree that he never had a seizure or other neurological condition prior to the seizure of November 14, 2017. On that day, Dr. Massey noted Madron's vital signs and other clinical assessments, and acknowledged that

his mother and aunt have seizure disorders. Dkt. No. 1–1 at 8. Dr. Massey also noted that Madron had no history of seizures, found him alert and oriented and able to recount his history, and, finally, concluded that Madron had a "questionable [history] of [seizure]. *Id.* The clinical records reflect a treatment plan of "Return to clinic as needed," and "since there is no [definite history] of [seizure] will [discharge] and reevaluate if further [seizure] occur." *Id.*

It would be difficult to conclude, at least as of November 14, 2017, that a single unconfirmed seizure over a 31-year life substantially limited one of Madron's major life activities. The clinical findings available to Dr. Massey at the time suggested the opposite, *i.e.*, that this was transitory, one-off episode. But accepting Madron's allegations as true, including his family history, and construing them in a light most favorable to him, as the Court must, the undersigned will assume this element in Madron's favor.

    *b.  Excluded from a service, program, or activity.*

The next prima facie element under Title II is whether Madron was being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible. *Smith*, 956 F.3d at 317. Interpreting this broadly in Madron's favor, the TDCJ provides services in the nature of medically safe housing, bunk,, and job assignments. Madron appears to allege that the accommodations he sought, *i.e.*, lower floor, bottom bunk, and no jobs with machinery having moving parts, deprives him

of participation in those services. Again, construing his allegations liberally, the undersigned assumes that Madron can satisfy this element of an ADA claim.

    *c.  By reason of his disability.*

Lastly, the Court must consider whether Madron's exclusion from the services, programs, or activities alleged was "by reason of his disability." *Smith*, 956 F.3d at 317. This element addresses causation and intentionality. Madron's ADA claim is a classic failure-to-accommodate claim. And the undersigned accepts as true that Madron requested the accommodations at issue here.

What is less clear is whether Dr. Massey either knew Madron suffered from his alleged disability or otherwise considered him to have a disability. *See Cadena*, 946 F.3d at 723–24. Even Madron seems to fault Dr. Massey for not connecting those dots. Thus, it appears even from Madron's allegations that Dr. Massey did not believe he needed an accommodation. Nor does it appear that Dr. Massey, based on his November 14 observations, clinical findings, and medical judgment, considered Madron to have either a seizure *disorder* or other disability necessitating accommodations.

Ultimately, there are no factual allegations demonstrating that Dr. Massey intentionally discriminated against Madron *due to his alleged disability. See Back v. Tex. Dep't of Crim. J. Corr. Inst. Div.*, 716 F. App'x 255, 258 (5th Cir. 2017) (per curiam) (affirming dismissal of prisoner's ADA claim where he did not allege defendant intentionally discriminated against him due to his disability).

Again, while the Fifth Circuit "ha[s] not 'delineate[d] the precise contours' of [the] intentionality requirement," more is required than even deliberate indifference." *Paley*, 81 F.4th at 449–50 (citing *Cadena*, 946 F.3d at 724). And for reasons explained above in connection with Madron's deliberate indifference claim, the undersigned is unable to reach that conclusion on these facts.

For these reasons, the undersigned RECOMMENDS that Madron's ADA and Re-hab Act claims be dismissed for failure to state a claim upon which relief may be granted.

## V. <u>FURTHER LEAVE TO AMEND WOULD BE FUTILE</u>

"Ordinarily, 'a *pro se* litigant should be offered an opportunity to amend his com-plaint before it is dismissed.'" *Wiggins v. La. State Univ. – Health Care Servs. Div.*, 710 F. App'x 625, 627 (5th Cir. 2017) (per curiam) (quoting *Brewster v. Dretke*, 587 F.3d 764, 767–68 (5th Cir. 2009)). But leave to amend is not required where an amendment would be futile, *i.e.*, "an amended complaint would still 'fail to survive a Rule 12(b)(6) motion,'" *Stem v. Gomez*, 813 F.3d 205, 215–16 (5th Cir. 2016) (quoting *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014)), or where a plaintiff has already amended his claims, *see Nixon v. Abbott*, 589 F. App'x 279, 279 (5th Cir. 2015) (per curiam) ("Contrary to Nixon's argument, he was given the opportunity to amend his complaint in his responses to the magistrate judge's questionnaire, which has been recog-nized as an acceptable method for a *pro se* litigant to develop the factual basis for his com-plaint." (citation omitted)).

Here, Madron received an opportunity to amend his claims through the Court's questionnaire. However, his responses did not correct the deficiencies within his Complaint. For this reason, the undersigned finds that further leave to amend would be futile.

## VI.  CONCLUSION

For the reasons explained in this FCR, the undersigned recommends that this case be DISMISSED WITHOUT PREJUDICE under Rule 41(b). Alternatively, the Court should DISMISS Madron's claims against Dr. Massey as frivolous and for failure to state a claim under 28 U.S.C. §§ 1915(e)(2) and 1915A(b).

## VII.  RIGHT TO OBJECT

A copy of these Findings, Conclusions, and Recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these Findings, Conclusions, and Recommendations must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendations where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the

magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

## VIII.  TRANSFER OF CASE

Having completed the preliminary screening of Madron's claims, the undersigned ORDERS that this case be TRANSFERRED back to the docket of the Senior United States District Judge and designated as Civil Action No. 1:22-CV-31-C.

ORDERED this 5th day of August 2024.


_____
JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE

30